# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **TROY ANDREWS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 04-2535** |
| **BURL CAIN, WARDEN** | **SECTION "N"(5)** |

## REPORT AND RECOMMENDATION

This matter was referred to a United States Magistrate Judge to conduct hearings, including an evidentiary hearing, if necessary, and to submit proposed findings and recommendations pursuant to 28 U.S.C. §636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases. Upon review of the entire record, the court has determined that a federal evidentiary hearing is unnecessary. See 28 U.S.C. §2254(e)(2).[1] For the following reasons, it is recommended that the instant

---

[1] Under 28 U.S.C. §2254(e)(2), whether to hold an evidentiary hearing is a statutorily mandated determination. Section 2254(e)(2) authorizes the district court to hold an evidentiary hearing only when the petitioner has shown either that the claim relies on a new, retroactive rule of constitutional law that was previously unavailable, 28 U.S.C. §2254(e)(2)(A)(i), or the claim relies on a factual basis that could not have been previously discovered by exercise of due diligence, 28 U.S.C. §2254(e)(2)(A)(ii); and the facts underlying the claim show by clear and convincing evidence that, but for the constitutional error, no reasonable jury would have convicted the petitioner. 28 U.S.C. §2254(e)(2)(B).

petition for habeas corpus relief be **DENIED** and **DISMISSED WITH PREJUDICE.**

I. STATE COURT PROCEDURAL BACKGROUND

The petitioner, Troy Andrews, is incarcerated in the Louisiana State Penitentiary in Angola, Louisiana.[2]  On February 15, 1996, Andrews, along with co-defendants Terry West and Gentry Sylvester, was indicted by a grand jury in Orleans Parish for the first degree murder of Jody Harris.[3]  The Louisiana Fourth Circuit Court of Appeal summarized the facts of the case in relevant part as follows:

> Zindell Harris, the victim's wife, testified that she and the victim lived at 6343 Baccich Street, approximately one block from the corner of Mexico Street, where the victim was shot to death.  She said the victim had recently received some insurance money from a disability-related settlement.  Mrs. Harris said Terry West had been a groomsman in her and the victim's 1995 wedding.  He was a friend of the victim's, and she had had [sic] known him since she started dating the victim five years before her marriage.  On the night of December 23, 1995, she and her husband were celebrating her 29th birthday at their home with family and friends.  Jamie Espadron, a friend of the victim, was there, as was Kim Ford, and Shazell Keyes, Mrs. Harris' sister.  Jamie and the victim left the party about 10:00 or 10:30 p.m. to go to Terry West's residence to get some things for the party.  Kim Ford told her that Terry West had paged the victim.  Later, Jamie Espadron's girlfriend telephoned to inform her that "they" had kidnapped the victim.  Terry West came to the door a few minutes later and told her that "they" kidnapped the victim, and that if she did not give "them" the money "they" were going to kill him. West also at one point said give "us" the money.  When Mrs. Harris replied that she did not know where the money was, West said to check on top of the bed.  She found the money there, and gave it to West, who then left.  After West left, Mrs. Harris' aunt telephoned the police. Shazell Keyes and Kim Ford

---

[2]Rec. Doc. Nos. 1, 15.

[3]St. Rec. Vol. 1 of 5, Indictment, 2/15/96; St. Rec. Vol. 3 of 5, Grand Jury Return, 2/15/96.

2

told her they heard two shots after West left. As Mrs. Harris
and the others prepared to walk outside, West reappeared. He
was unharmed, and did not give Mrs. Harris the money back.
Mrs. Harris found the victim lying on the curb on Mexico
Street. He was still alive and said, "love you" to her
several times before an ambulance arrived. She rode in the
ambulance with him to the hospital, where he died later that
night. Terry West was arrested that night. Mrs. Harris said
that Kenyatta Packnett was a friend of her late husband's.
She learned that he was present when her husband was
kidnapped. He was afraid to come forward at first, but
eventually talked to police. Mrs. Harris admitted on cross
examination that in February 1998, she testified at the trial
of Terry West that she believed the cash she gave West had
been drug money. She claimed that since that trial she
learned that it had been insurance money. Mrs. Harris also
admitted that her husband sold marijuana.
                          . . .
     Russell Plummer testified that he was spending the
weekend at his friend Terry West's apartment, and he was there
on December 23, 1995. He was sleeping in a bedroom, when he
heard a knock on the front door. He looked through the
peephole, and saw Terry West. Mr. Plummer opened the door,
and turned and immediately walked back into the bedroom to go
back to sleep. Ten to fifteen minutes later, he heard someone
saying "Bitch, lay down," and heard a lot of yelling. He
looked out of the bedroom door and saw someone going out of
the back door. He closed the bedroom door and locked it. The
yelling went on for ten to fifteen minutes, and then suddenly
stopped. After waiting a while, he left the bedroom, and
found two people unconscious with the front and back doors
open. He locked both doors, and was getting dressed, when
someone began shooting into the back of the apartment, into
the kitchen. He sought refuge in the closet. The shooting
stopped, only to resume at the front door. He telephoned the
police, and the shooting stopped. Then someone began shooting
into the front window of the apartment. When police arrived
he, Terry West and another individual were taken to police
headquarters for questioning. He and the other individual
were later taken home, but Terry West was detained. Mr.
Plummer said he had not seen anyone come inside with Terry
West, and did not recognize any of the voices. He had met
Terry West in the Desire Housing Project, and also knew
defendant from the project. He had seen the victim before,
but did not know him. Mr. Plummer testified on cross
examination that he had never known Terry West to traffic in
marijuana, and had never seen marijuana in West's apartment.
     James Espadron grew up with the victim. On the night of
the murder, he attended the party for the victim's wife at
their home. He was driving a blue Nissan Maxima, registered
to the mother of his then girlfriend, who at the time of trial
was his wife. He and the victim left the party at about 10:30
p.m., intending to go to a liquor store and to Terry West's

apartment in the St. Bernard Housing Project. The victim was driving the Nissan Maxima at that time, and was in possession of the keys to it when they went to Terry West's apartment. Terry West let them into his apartment. The victim's cousin, Kenyatta, was there, and someone was sleeping in the bedroom. Mr. Espadron went into the kitchen to get a glass of water and while there, heard a knock on the front door. This happened within two minutes of entering the apartment. Terry West answered the door, and someone unknown to him burst in yelling "get on the floor." At that point James Espadron ran out of the back door and went to a friend's nearby apartment in the project. He notified police, and then telephoned the victim's wife and told her what had happened. Mrs. Harris told him that Terry West was there asking for money. Mr. Espadron testified that prior to going to Terry West's apartment there had been no blood in the Nissan Maxima. He did not know defendant, and could not say that the defendant had been in Terry West's apartment that night. Mr. Espadron testified on cross examination that he had been to Terry West's apartment four or five times before that night, and said he had never seen any marijuana there. He also said he had never seen the victim in possession of marijuana. He said there was someone else in Terry West's apartment, who was with Kenyatta.

. . .

Kenyatta Packnett testified that on the night of December 23, 1995, he and John Thomas met the victim and Jamie Espadron, who were in Jamie's car, and they all went to Terry West's apartment. Terry let them inside. Jamie Espadron went into the kitchen to get a glass of water, and while he was there, someone knocked on the door. Terry West opened the door, and Gentry Sylvester and defendant entered, each holding a gun. The two gunmen made him, Terry West, the victim, and John Thomas, all get on the ground. Jamie Espadron ran. Defendant grabbed the victim and repeatedly struck him with a gun. Gentry Sylvester held a gun on the rest of them. Defendant then pistol-whipped him and John Thomas, knocking Thomas out. Defendant forced the victim to walk out of the front door. Terry West followed then out, followed by Gentry Sylvester. Before leaving, Gentry Sylvester, whom he knew, told him that they were going to kill the victim. Terry West's cousin came from the back of the apartment, and the two of them tried to revive John Thomas. Then someone started shooting. Kenyatta said he tried to call police on a cellular telephone. He talked to police that night at Terry West's house, but they apparently were unaware that he had been in the house at the time of the invasion, and he did not give a statement until a day or two later. Mr. Packnett did not know defendant's name that night, but later identified his photograph in a lineup presented to him by police.

Kenyatta Packnett stated on cross examination that the victim was his cousin. He said he would not know if the victim sold marijuana, and said he had never seen him sell any. He knew Terry West before that night, but had never seen

any marijuana in his apartment.  He recalled the gunmen saying "Bitch, get down, Bitch."  Kenyatta said that at the time he went to police he knew defendant's first name was Troy, because Gentry Sylvester had told him.  He admitted originally describing defendant to police as a tall black male with a beard, but acknowledged that none of the individuals in the photographic lineup had beards.  Kenyatta acknowledged that Terry West's arm and leg on one side were handicapped.  He did not remember what defendant was wearing that night.  He said the individual in the bedroom never tried to telephone police.  Kenyatta said that Gentry Sylvester came to his home early on the morning after the incident, wanting to know if he had told police anything, and that was when he mentioned that the other individual was named Troy.

. . .

Patricia Andrews, defendant's aunt, testified that defendant was living with her at 3503 Pleasure Street in December 1995.  She said that she went to a church service on December 23, which began at 7:45 p.m.  She said the service ended sometime around 9:30 or 10:00 p.m.  She was washing her hair, rushing to say her nightly prayers, when defendant and his friend, Stephen Singleton, left.  She said that was approximately 12:05 a.m., on December 24.  However, on cross examination, Ms. Andrews twice testified that the Tabernacle and Deliverance church service she attended had been on Friday night, which would have been December 22.  She said her church did not have services on Saturday, which would have been December 23, the night of the events culminating in the murder.  Ms. Andrews was unaware of the dates, but knew it had been Friday night when she washed her hair and defendant and his friend were at her home.  Contradicting that testimony, however, she testified on re-direct examination that she washed her hair the night before had to got to church on Sunday because she sang in the church choir and wanted to have clean hair.  On re-cross examination, Ms. Andrews again said she washed her hair after the Deliverance service, and that the deliverance service was on Friday.  Ms. Andrews also first said that defendant did not have a beard, but after being shown photographs of him, acknowledged that he had a goatee and a moustache.

Joycelyn Mason, defendant's friend, testified that defendant came to her home at approximately 10:30 p.m. on December 23, and stayed until 11:25 p.m.  Ms. Mason said she lived at 3611 Pleasure Street.  She said defendant later telephoned her from his aunt's home, to let her know he had gotten inside.  He told her he was going to a restaurant, and he telephoned her from the restaurant at approximately 12:30 p.m.  Ms. Mason said she remembered the dates because her telephone caller identification system recorded them.  She learned of defendant's arrest several days later, from his aunt.  Ms. Mason said she knew that the night defendant was at her home was the same night defendant's aunt was at home

washing her hair. She recalled that defendant only had a moustache, not any hair on his chin.

Stephen Singleton admitted to two prior convictions for possession of cocaine and, on cross examination, to one for possession of a sawed-off rifle. He testified that late December 23, and early December 24, 1995, he was with defendant. They left his aunt's residence and drove, in her car, to a restaurant at Bullard and the I-10 Service Road. Mr. Singleton drove, and he and defendant did not leave the restaurant until 1:00 a.m. He said defendant was at his aunt's home at approximately 11:35 p.m. Defendant's aunt had just gotten back from a Deliverance service at her church and was washing her hair. He said this had been on a Friday night. On redirect examination, however, he indicated that this had been on a Saturday night, and suggested on recross examination that defendant's aunt could have been mistaken if she said it had been a Friday night.

State v. Andrews, 786 So.2d 982 (La. App. 4th Cir. 2001) (Table); State Record Volume 2 of 5, Louisiana Fourth Circuit Opinion, 2000-KA-1106, pages 2-10, February 7, 2001.

On May 12, 1998, the state trial court granted the defenses' motion to sever the trials and proceeded to the trial of Gentry Sylvester before a jury.[4] The jury found Sylvester guilty as charged of first degree murder.[5] Based on the jury's recommendation in the penalty phase, the state trial court sentenced Sylvester to life imprisonment on May 26, 1998.[6]

The second co-defendant, Terry West, was tried before a jury on February 9, 10, and 11, 1998 and was found guilty as charged of

---

[4]St. Rec. Vol. 1 of 5, Minute Entry, 5/12/98; Minute Entry (Gentry Sylvester), 5/13/98.

[5]St. Rec. Vol. 1 of 5, Minute Entry (Gentry Sylvester), 5/13/98.

[6]St. Rec. Vol. 1 of 5, Minute Entry (Gentry Sylvester), 5/14/98; Minute Entry (Gentry Sylvester), 5/26/98.

first degree murder.[7]  After the jury was unable to agree on a sentence in the penalty phase, the state trial court sentenced West to life imprisonment.[8]

Andrews was later tried by a jury on November 16 and 17, 1998, and also was found guilty as charged of first degree murder.[9]  The jury was deadlocked in the sentencing phase held November 18, 1998.[10]  Thus, the state trial court sentenced Andrews to life imprisonment on January 12, 1999.[11]  The state trial court also denied Andrews's motions for new trial.[12]

On appeal, Andrews argued that his counsel gave ineffective assistance when he failed to object to certain hearsay testimony and failed to prepare witnesses for an alibi defense.[13]  The Louisiana Fourth Circuit affirmed the conviction and sentence on February 7, 2001, finding no merit to Andrews's claim.[14]

---

[7]St. Rec. Vol. 1 of 5, Minute Entry (Terry West), 2/9/98; Minute Entry (Terry West), 2/10/98; Minute Entry (Terry West), 2/11/98.

[8]St. Rec. Vol. 1 of 5, Minute Entry (Terry West), 2/12/98; Minute Entry (Terry West), 5/11/98.

[9]St. Rec. Vol. 1 of 5, Trial Minutes, 11/16/98; Trial Minutes, 11/17/98; St. Rec. Vol. 2 of 5, Jury Verdict, 11/17/98.

[10]St. Rec. Vol. 1 of 5, Trial Minutes, 11/18/98.

[11]St. Rec. Vol. 3 of 5, Sentencing Minutes, 1/12/99.

[12]Id.; see St. Rec. Vol. 3 of 5, Motion for New Trial, 1/12/99 (stamped 1/15/99); Motion for New Trial (pro se), 1/12/99 (stamped 1/15/99).

[13]St. Rec. Vol. 2 of 5, 4th Cir. Opinion, 2000-KA-1106, 2/7/01.

[14]State v. Andrews, 786 So.2d at 982; St. Rec. Vol. 2 of 5, 4th Cir. Opinion, 2000-KA-1106, 2/7/01.

The Louisiana Supreme Court denied Andrews's subsequent writ application without reasons on January 11, 2002.[15] His conviction became final 90 days later, on April 12, 2002, when he did not file a petition for writ of certiorari in the United States Supreme Court. Ott v. Johnson, 192 F.3d 510, 513 (5th Cir. 1999) (period for filing for certiorari with the United States Supreme Court is considered in the finality determination under 28 U.S.C. §2244(d)(1)(A)), cert. denied, 529 U.S. 1099 (2000); U.S. Sup. Ct. Rule 13(1).

On some unknown date, Andrews filed an application for post-conviction relief with the state trial court alleging three grounds for relief: (1) "insufficient counsel;" (2) insufficient evidence; and (3) "credibility of the witnesses."[16] The state trial court, on March 17, 2003, denied relief because Andrews had not submitted anything to support his claims.[17]

_____

[15]State v. Andrews, 807 So.2d 228 (La. 2002). The record does not contain a copy of this order or the related writ application. See also, St. Rec. Vol. 2 of 5, La. S. Ct. Letter, 2001-KO-775, 3/22/01. Pursuant to La. Code Crim. P. art. 922(C) and La. S. Ct. R. X§5, petitioner had 30 days from the issuance of the state appellate court's opinion to mail or file a writ application in the Louisiana Supreme Court. The letter from the clerk of the Louisiana Supreme Court indicates that the application was mailed by Andrews within that time period on February 20, 2001.

[16]St. Rec. Vol. 2 of 5, Motion for Post-Conviction, no file or signature date indicated. The State concedes that can not establish a filing date for this pleading and none can be discerned from Andrews's state or federal pleadings. This court's best efforts also have been unable to locate a filing date amongst any of the pleadings.

[17]St. Rec. Vol. 1 of 5, Trial Court Judgment, 3/17/03; Minute Entry, 3/20/03.

Andrews sought review in the Louisiana Fourth Circuit on the claims of insufficient evidence and ineffective assistance of counsel where counsel:[18] (1) failed to effectively cross-examine witnesses; (2) failed to interview witnesses before trial; (3) failed to subpoena John Thomas to trial; (4) failed to interview Thomas or Packnett before trial; and (5) failed to effectively cross-examine Packnett because he had not been interviewed before trial. Andrews also provided the appellate court with a copy of a purported supplemental post-conviction brief, captioned for the trial court. This copy included the expanded arguments in support of the ineffective assistance of counsel claim which were not indicated in Andrews's original application for post-conviction relief.[19]

The Louisiana Fourth Circuit denied Andrews's application finding no error in the trial court's ruling.[20] The Louisiana Supreme Court also denied without reasons Andrews's subsequent writ application to that court in which he raised the same claims, insufficient evidence and ineffective assistance of counsel, and argued that the Louisiana Fourth Circuit erred in failing to

---

[18]St. Rec. Vol. 5 of 5, 4th Cir. Writ Application, 2003-K-0784, 4/29/03 (signed 4/15/03).

[19]St. Rec. Vol. 5 of 5, Supplemental Brief, 5/7/03 (signed 4/25/03). There is no copy of a supplemental brief filed in the state trial court. Notably, the copy sent to the Louisiana Fourth Circuit was signed by Andrews after the trial court ruled and after the appellate writ application was filed.

[20]St. Rec. Vol. 5 of 5, 4th Cir. Order, 2003-K-0784, 5/22/03.

correct the trial court's erroneous denial of relief without a hearing.[21]

II.  <u>FEDERAL HABEAS PETITION</u>

On July 25, 2006, Andrews filed a petition for federal habeas corpus relief in this court raising three grounds for relief:[22] (1) the Louisiana Fourth Circuit violated clearly established law in failing to correct the trial court's erroneous denial of relief without a hearing; (2) insufficient evidence to convict; and (3) counsel gave ineffective assistance where he failed to effectively cross-examine the witnesses and failed to interview witnesses before trial.

The State filed a response in opposition to Andrews's petition conceding that the timeliness of the petition could not be challenged because of the unavailability of a date of filing on the state court application for post-conviction relief.  The State did not address Andrews's first claim regarding legal error by the state appellate court.  The State instead argued that Andrews's insufficient evidence claim is procedurally barred from review under state law because it was not raised on direct appeal.  The State also contends that the ineffective assistance of counsel

---

[21]<u>State ex rel. Andrews v. State</u>, 877 So.2d 132 (La. 2004); St. Rec. Vol. 5 of 5, La. S. Ct. Order, 2003-KH-1952, 7/2/04.  <u>See also</u>, St. Rec. Vol. 5 of 5, La. S. Ct. Writ Application, 03-KH-1952, 7/10/03.  A member of the court's staff contacted the office of the clerk of the Louisiana Supreme Court and was advised that Andrews's writ application was timely postmarked on Monday, June 23, 2003.

[22]Rec. Doc. No. 1.

claim is not exhausted because the same arguments were not raised in the state trial court. Andrews filed a reply to the State's opposition arguing that justice would not be served if the merits of his claims are not reviewed.

III. <u>GENERAL STANDARDS OF REVIEW</u>

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, comprehensively revised federal habeas corpus legislation, including 28 U.S.C. §2254. The AEDPA went into effect on April 24, 1996[23] and applies to habeas petitions filed after that date. <u>Flanagan v. Johnson</u>, 154 F.3d 196, 198 (5th Cir. 1998) (citing <u>Lindh v. Murphy</u>, 521 U.S. 320 (1997)). The AEDPA therefore applies to Andrews's petition, which, for reasons discussed below, is deemed filed in this federal court on September 2, 2004.[24]

---

[23]The AEDPA, which was signed into law on that date, does not specify an effective date for its non-capital habeas corpus amendments. Absent legislative intent to the contrary, statutes become effective at the moment they are signed into law. <u>United States v. Sherrod</u>, 964 F.2d 1501, 1505 (5th Cir. 1992).

[24]The Fifth Circuit has recognized that a "mailbox rule" applies to pleadings, including habeas corpus petitions filed after the effective date of the AEDPA, submitted to federal courts by prisoners acting pro se. Under this rule, the date when prison officials receive the pleading from the inmate for delivery to the court is considered the time of filing for limitations purposes. <u>Coleman v. Johnson</u>, 184 F.3d 398, 401 (5th Cir. 1999), <u>cert. denied</u>, 529 U.S. 1057 (2000); <u>Spotville v. Cain</u>, 149 F.3d 374, 378 (5th Cir. 1998); <u>Cooper v. Brookshire</u>, 70 F.3d 377, 379 (5th Cir. 1995). Andrews's petition was filed by the clerk of court on July 25, 2006, when the filing fee was paid. Andrews dated his signature on the application on September 2, 2004. This is the earliest date on which he could have delivered the pleadings to prison officials for mailing. The fact that he paid the filing fee on a later date does not alter the application of the federal mailbox rule to his pro se petition. <u>See Cousin v. Lensing</u>, 310 F.3d 843 (5th Cir. 2002) (mailbox rule applies even if inmate did not pay the filing fee at the time of mailing) (citing <u>Spotville</u>, 149 F.3d at 374). The

The threshold questions in habeas review under the amended statute are whether the petition is timely and whether the claims raised by the petitioner were adjudicated on the merits in state court; i.e., the petitioner must have exhausted state court remedies and must not be in "procedural default" on a claim. Nobles v. Johnson, 127 F.3d 409, 419-20 (5th Cir. 1997) (citing 28 U.S.C. §2254(b), (c)).

In this case, the State first asserts that the insufficient evidence claim is in default under state procedural law. Specifically, the State argues that state law requires that insufficient evidence be raised on direct appeal before it can be considered on post-conviction review. The court has reviewed the post-conviction decisions of the state trial, appellate and Supreme courts. None of the state courts indicated that its decision was based on a state procedural rule of law.

To the contrary, the state trial court indicated that its denial was based on a lack of support for the claims.[25] The state appellate court, which provided the last reasoned decision, indicated that Andrews "failed to demonstrate that relief should be granted."[26] The Louisiana Supreme Court's one-word denial is

court is aware that the signature on the brief in support of the federal petition is dated August 20, 2004. This prior inconsistent date is of no concern since the timeliness of this petition is not at issue.

[25]St. Rec. Vol. 1 of 5, Trial Court Judgment, 3/17/03.

[26]St. Rec. Vol. 5 of 5, 4th Cir. Order, 2003-K-0784, 5/22/03.

presumed to follow this prior reasoned decision.[27]   <u>Ylst v.</u>
<u>Nunnemaker</u>, 501 U.S. 797, 802 (1991) (When the last state court
judgment does not indicate whether it is based on procedural
default or the merits of a federal claim, it is presumed that the
court relied upon the same grounds as the last reasoned state court
opinion).  Thus, with no indication that a state procedural rule
was relied upon by any of the state courts, the court must presume
that the claims were denied on the merits and can be reviewed by
this Court.

The State also alleges that Andrews has not fully exhausted
available state court remedies as to his ineffective assistance of
counsel claims.  The state contends that the state court record
does not establish that Andrews raised the expanded or supplemental
ineffective assistance of counsel arguments in the state trial
court before proceeding to seek review of these arguments in the
Louisiana Fourth Circuit and the Louisiana Supreme Court.

Andrews's state application for post-conviction relief does
not contain specific arguments in support of the ineffective
assistance of counsel claim nor does the trial court record contain
the alleged supplemental application.  Nevertheless, the court
finds that Andrews's failure to fully exhaust state court remedies
with respect to the arguments raised in this federal petition does

_____

[27]<u>State ex rel. Andrews v. State</u>, 877 So.2d at 132; St. Rec. Vol. 5 of
5, La. S. Ct. Order, 2003-KH-1952, 7/2/04.

not prevent this court from dismissing the claims on the merits, since relief is not warranted for the reasons set forth below. 28 U.S.C. §2254(b)(2).

IV.  <u>STANDARDS OF REVIEW ON THE MERITS</u>

Amended 28 U.S.C. §§2254(d)(1) and (2) contain revised standards of review for questions of fact, questions of law and mixed questions of fact and law in federal habeas corpus proceedings. <u>Nobles</u>, 127 F.3d at 419-20 (citing 28 U.S.C. §2254(b) and (c)).

Determinations of questions of fact by the state court are "presumed to be correct . . . and we will give deference to the state court's decision unless it 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000) (quoting 28 U.S.C. §2254(d)(2)), <u>cert. denied,</u> 532 U.S. 1039 (2001). The amended statute also codifies the "presumption of correctness" that attaches to state court findings of fact and the "clear and convincing evidence" burden placed on a petitioner who attempts to overcome that presumption. 28 U.S.C. §2254(e)(1).

A state court's determination of questions of law and mixed questions of law and fact are reviewed under 28 U.S.C. §2254(d)(1) and receive deference, unless the state court's decision "'was contrary to, or involved an unreasonable application of, clearly

established [Supreme Court precedent.]'"  Penry v. Johnson, 215

F.3d 504, 507 (5th Cir. 2000) (quoting Miller v. Johnson, 200 F.3d

274, 280-81 (5th Cir.), cert. denied, 531 U.S. 849 (2000)), aff'd

in part, rev'd in part on  other grounds, 532 U.S. 782 (2001);

Hill, 210 F.3d at 485.   The United States Supreme Court has

clarified the Section 2254(d)(1) standard as follows:

> Under the "contrary to" clause, a federal habeas court
> may grant the writ if the state court arrives at a
> conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case
> differently than this Court has on a set of materially
> indistinguishable facts.   Under the "unreasonable
> application" clause, a federal habeas court may grant the
> writ if the state court identifies the correct governing
> legal principle from this Court's decisions but
> unreasonably applies that principle to the facts of the
> prisoner's case.

Williams v. Taylor, 529 U.S. 362, 405-06, 412-13 (2000);  Penry,

532 U.S. at 792-93;  Hill, 210 F.3d at 485.   "'A federal habeas

court may not issue the writ simply because that court concludes in

its independent judgment that the state court decision applied [a

Supreme Court case] incorrectly.'"  Price v. Vincent, 538 U.S. 634,

641 (2003) (quoting Woodford v. Visciotti, 537 U.S. 19, 24-25

(2002)) (brackets in original); Bell v. Cone, 535 U.S. 685, 699

(2002).   Rather, under the "unreasonable application" standard,

"the only question for a federal habeas court is whether the state

court's determination is objectively unreasonable."   Neal v.

Puckett, 286 F.3d 230, 246 (5th Cir. 2002), cert. denied, sub nom,

Neal v. Epps, 537 U.S. 1104 (2003). The burden is on the petitioner

to show that the state court applied the precedent to the facts of
his case in an objectively unreasonable manner. <u>Price</u>, 538 U.S. at
641 (quoting <u>Woodford</u>, 537 U.S. at 24-25); <u>Wright v. Quarterman</u>,
470 F.3d 581, 585 (5th Cir. 2006).

V.    <u>LOUISIANA APPELLATE COURT ERROR</u>

Andrews first alleges that the Louisiana Fourth Circuit erred
when it failed to correct the trial court's erroneous denial of his
application for post-conviction relief.  He argues that the state
trial court erred when it denied his application without legal
citation, without a response from the State under La. Code Crim. P.
art. 927, and without an evidentiary hearing under La. Code Crim.
P. art. 930.

Andrews   has   failed   to   present   a   cognizable   federal
constitutional claim.  He has not alleged that the Louisiana Fourth
Circuit, or the state trial court, violated constitutional or
federal law by denying his application.  Federal habeas corpus
relief may be granted only to remedy violations of the Constitution
and laws of the United States; mere violations of state law simply
will not suffice.  28 U.S.C. §2254; <u>Engle v. Isaac</u>, 456 U.S. 107,
119 (1983); <u>Prieto v. Quarterman</u>, No. Civ. SA01CA11450G, 2006 WL
4059282, at *5 (W.D. Tex. Dec. 18, 2006), <u>aff'd</u>, No. 07-70001, 2008
WL 4218822 (5th Cir. Sept. 15, 2008).  A federal habeas court does
not sit to correct errors made by state courts in interpreting and
applying state law.  <u>Narvaiz v. Johnson</u>, 134 F.3d 688, 695 (5th

Cir. 1998) (quoting <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991) and <u>Lewis v. Jeffers</u>, 497 U.S. 764, 780 (1990), and citing <u>West v. Johnson</u>, 92 F.3d 1385, 1404 (5th Cir.1996)); <u>accord</u> <u>Turner v. Johnson</u>, 46 F. Supp. 2d 655, 674 (S.D. Tex. 1999). "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." <u>Estelle</u>, 502 U.S. at 67-68; <u>see also</u> <u>Molo v. Johnson</u>, 207 F.3d 773, 776 n. 9 (5th Cir. 2000) ("Federal habeas review does not extend to state court conclusions of state law."); <u>Hoque v. Johnson</u>, 131 F.3d 466, 506 (5th Cir. 1997) (a disagreement as to state law is not cognizable on federal habeas review). This court will not review Andrews's claim that the Louisiana courts erred under state law.

To the extent, under the broadest reading, Andrews may claim that he was denied due process[28] in the handling of his application for post-conviction relief by the state courts, he is not entitled to relief in this court. As will be discussed in this report, Andrews substantive claims are without merit and not supported by the state court record. Thus, the state courts' summary denial of his post-conviction substantive claims did not deny him due process or render the post-conviction proceedings fundamentally unfair

---

[28]This court's habeas corpus review focuses on due process considerations, and due process requires that the court grant the writ only when the errors of the state court made the underlying proceeding fundamentally unfair. <u>Neyland v. Blackburn</u>, 785 F.2d 1283, 1293 (5th Cir. 1986). As a general matter, due process requires that state court proceedings be fundamentally fair. <u>Lisenba v. People of the State of California</u>, 314 U.S. 219, 236-37 (1941).

17

under federal law. Andrews is not entitled to relief on this claim.

VI.  <u>INSUFFICIENT EVIDENCE</u>

Andrews alleges that the evidence was insufficient because there was no basis to establish the reliability of the identification made by Kenyatta Packnett.[29] The identification made by Packnett was first challenged in the pretrial motions to suppress filed by defense counsel.[30]

The state trial court called three hearings to receive testimony regarding the validity of the identification evidence.[31] The court heard the testimony of Detective Joseph Waguespack who conducted the photographic line-ups and took statements from the witnesses. Packnett testified at the second hearing about what he saw and how he came to identify Andrews as a perpetrator. Each of them were cross-examined by Andrews's counsel.

A third hearing was scheduled to take the testimony of John Thomas, who was living out of state. The record does not indicate the resolve of this third hearing.

---

[29]As noted above, the State argues that this claim was barred under state procedural law which would have required that it be raised first on direct appeal. The state courts made no such ruling and did not clearly rely on a state procedural rule in denying relief.

[30]St. Rec. Vol. 3 of 5, Docket Master, entries dated 7/1/96 & 9/9/96; Motion to Suppress Identification Evidence, 7/1/96; Motion to Adopt Co-defendants' Pretrial Motions, 9/9/96.

[31]St. Rec. Vol. 3 of 5, Motion Hearing Transcript, 7/22/96; Motion Hearing Transcript, 8/16/96; <u>see also</u>, St. Rec. Vol. 4 of 5, Trial Transcript, p.186, 11/17/98.

In his post-conviction application, Andrews raised the issue of insufficient evidence to convict him because of the allegedly unreliable identification made by Packnett. The trial court denied relief because Andrews "failed to provide anything to support any of his claims."[32] The last reasoned decision on this issue was that of the Louisiana Fourth Circuit which held that Andrews "failed to demonstrate that relief should be granted" and found no error in the trial court's denial of relief.[33]

A claim of insufficient evidence presents a mixed question of law and fact. <u>Maes v. Thomas</u>, 46 F.3d 979, 988 (10th Cir. 1995). Therefore, this court must examine whether the state courts' denial of relief was contrary to, or an unreasonable application of, United States Supreme Court precedent.

Andrews was found guilty of first degree murder during the perpetration of the aggravated kidnapping of Jody Harris. He argues that the identification testimony provided by Packnett was insufficient to support the verdict against him. However, the reliability of Packnett's identification testimony is not the only factor to be addressed in determining the sufficiency of the evidence at Andrews's trial. The court is required to examine all

---

[32]St. Rec. Vol. 1 of 5, Trial Court Judgment, 3/17/03.

[33]St. Rec. Vol. 5 of 5, 4th Cir. Order, 2003-K-0784, 5/22/03. As outlined above, the Louisiana Supreme Court's order denied Andrews' subsequent writ application without reasons. <u>State ex rel. Andrews v. State</u>, 877 So.2d at 132; St. Rec. Vol. 5 of 5, La. S. Ct. Order, 2003-KH-1952, 7/2/04.

of the evidence under the well established federal standard set forth in Jackson v. Virginia, 443 U.S. 307 (1979).

Under Jackson, the court is to determine whether, after identifying the elements of the offense as defined by state substantive law and viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime to have been proven beyond a reasonable doubt. Jackson, 443 U.S. at 319; Donahue v. Cain, 231 F.3d 1000, 1004 (5th Cir. 2000); Gilley v. Collins, 968 F.2d 465, 467 (5th Cir. 1992); Guzman v. Lensing, 934 F.2d 80, 82 (5th Cir. 1991). The court's consideration of the sufficiency of the evidence extends only to what was presented at trial. Guzman, 934 F.2d at 82 (citing Tyler v. Phelps, 643 F.2d 1095, 1102 (5th Cir. 1981)).

First degree murder is defined by Louisiana law in relevant part as "the killing of a human being . . . [w]hen the offender has specific intent to kill or to inflict great bodily harm and is engaged in the perpetration or attempted perpetration of aggravated kidnapping . . ." La. Rev. Stat. Ann. §14:30(A)(1). Louisiana law also defines aggravated kidnapping as follows:

> Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:

(1) The forcible seizing and carrying of any person from one place to another; or
(2) The enticing or persuading of any person to go from one place to another; or
(3) The imprisoning or forcible secreting of any person.

La. Rev. Stat. Ann. §14:44.

The phrase "specific intent" is defined as the state of mind in which the perpetrator "actively desired the prescribed criminal consequences to follow his act or failure to act." La. Rev. Stat. Ann. §14:10(1). Under Louisiana law, intent need not be proven directly but may be inferred from the actions of the defendant and the circumstances surrounding those actions. State v. Sharlhorne, 554 So.2d 1317, 1321 (La. App. 1st Cir. 1989). Furthermore, under Louisiana law, "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." La. Rev. Stat. Ann. §14:24.

The jury was presented with the following inculpatory evidence of Andrews's guilt.[34] Zindell Harris, the wife of the victim Jody Harris, testified that she and Jody had a small birthday party for

---

[34]The copy of the trial transcript in the record provided by the State is not complete. For example, it is missing pages from Kenyatta Packnett's cross-examination testimony, p. 114-131, pages from the testimony of defense witness, Patricia Andrews, pp. 132-145, and the first page of testimony from defense witness Joyce Mason, p. 146. The court finds, nonetheless, that the transcript and record are more than adequate for the court to review the sufficiency of the state's evidence and the effectiveness of Andrews's counsel.

her at their home on the night he was killed.[35]  She testified that Harris and a guest, Jamie Espadron, left to get some things for the party from Terry West, who had called or paged Harris.[36]

She stated that she later received a call from Espadron's girlfriend who told her that Harris had been kidnapped.[37]  Terry West also later showed up at her house to tell her that Harris had been kidnapped.  West asked her to give him money or Harris would be killed.  She eventually found some money on top of the bed, where West told her to look.[38]  West left with the money and Mrs. Harris's aunt called the police.  Two of her other guests heard gunshots shortly after West left.  Mrs. Harris and her friends ran down the street and found Jody Harris lying on the curb.

James "Jamie" Espadron testified that, on the night of the murder, he drove with his girlfriend, now wife, Cindy to the Harris's party in a Nissan Maxima, which belonged to Cindy's mother.[39]  He and Jody Harris left the party and Harris drove them in the Maxima to Terry West's apartment.  West had previously asked Harris to go to his apartment that night.[40]

---

[35]St. Rec. Vol. 4 of 5, Trial Transcript, p.16-17.

[36]Id., p. 17.

[37]Id.

[38]Id., p. 18.

[39]Id., pp. 77-78.

[40]Id., p. 79.

When they arrived, West let them in and Kenyatta Packnett was already there. There also was someone sleeping in the bedroom. Espadron was in the kitchen to get a glass of water when he heard a knock at the door.[41] West opened the door and someone came in telling people to get on the floor. Espadron ran out of the back door. He ran to "Judy's house" where they called the police and Harris's wife. By that time, West had already arrived to ask Mrs. Harris for money. Espadron testified that he did not know Andrews and Andrews had never been in his mother-in-law's car.[42] Cindy Espadron also testified that she did not know Andrews nor had he been in her mother's car.[43]

Kenyatta Packnett testified that he and his cousin, John Thomas, went to Terry West's apartment to meet up with Jody Harris and Jamie Espadron.[44] After they arrived, everyone sat down and Espadron went to get a glass of water.[45] Shortly after they arrived, someone knocked at the door.[46] Terry West opened the door and two men came in with guns.[47] They told everyone to get on the

---

[41]Id., p. 80.

[42]Id., p. 82.

[43]Id., p. 86.

[44]Id., p. 94.

[45]Id., pp. 95-96.

[46]Id., p. 96.

[47]Id., pp. 96, 105.

floor and Espadron ran.  He recalled that John Thomas tried to run but Andrews grabbed him, threw him down, and hit him with the gun.[48] Packnett testified that Andrews grabbed Jody Harris and hit him with the gun.[49]  He also stated that Andrews hit him and hit John Thomas again with the gun.[50]  After the beatings, Andrews picked Harris up off of the ground and left with him.[51]  Terry West left with them too.[52]  Gentry Sylvester stayed behind and told Packnett that he would not be killed but they were going to kill Jody Harris.[53]

After Sylvester left, Packnett tried to help up John Thomas.[54] West's cousin came out from the back to help but they could not wake up Thomas.  When the gunshots began at the back of the apartment, Packnett went with West's cousin into the bedroom closet and Thomas remained unconscious.  Packnett testified that he did not give a statement right away because the police did not know he was in the house.[55]

---

[48]Id., p. 105.

[49]Id., p. 97.

[50]Id., pp. 97, 112.

[51]Id., pp. 97, 98.

[52]Id., p. 98.

[53]Id., p. 98.

[54]Id., p. 99.

[55]Id., p. 100.

Packnett also testified that, although he did not know Troy Andrews's name, he was able to give police a description and he picked out Andrews from the photographic line-up.[56] He testified that he learned his name from Gentry Sylvester after the incident.[57] Nevertheless, he also testified that the man in the photograph he chose was the man who hit them with guns and took Harris out of the apartment.

Russell Plummer testified that he was staying in West's apartment in the St. Bernard Housing Project at the time of the murder.[58] He stated that he was asleep when he heard a knock and awoke to let Terry West into the apartment.[59] Plummer returned to the bedroom, locked the door, and went back to bed. Ten or fifteen minutes later, he heard someone yell, "Bitch, lay down," with other loud voices and yelling like people were being hurt.[60] He looked out of the bedroom door and he saw someone go out of the backdoor. He closed and locked the door but could still hear yelling.[61] He waited a while and then went out to find two people unconscious on

---

[56]Id., pp. 100, 102.

[57]Id., p. 106.

[58]Id., p. 63.

[59]Id., p. 64.

[60]Id., pp. 64, 69.

[61]Id., pp. 64-65, 68-69.

the floor and both the front and back doors were open.[62]  He closed

and locked the doors.  He also saw blood on the inside of the front

door.[63]  He returned to the bedroom with one of the other men.

Soon, shooting broke out with bullets flying into the kitchen and

the back of the apartment.[64]  He went into the closet and the

shooting began to come from the front of the apartment.  He found

a cell phone and called the police.  While he was on the phone,

someone began shooting into the bedroom window causing glass to

fly.[65]  The police arrived shortly after the shooting stopped.

    Dr. Richard Tracey, the stipulated medical expert, testified

that Jody Harris had been shot four or five times; he believed that

one bullet may have passed through his arm and re-entered the

body.[66]  Two bullets struck him in the back near the shoulder blades

and caused the fatal injuries.  He was able to remove three bullets

from Harris's body.[67]  Dr. Tracey also testified that Harris

suffered blunt-force cuts to the back and side of his head.[68]

---

[62]Id., p. 65.

[63]Id., p. 73.

[64]Id., pp. 65, 70.

[65]Id., p. 66.

[66]Id., p. 6.

[67]Id., p. 11.

[68]Id., p. 7.

Officer James Gehagan testified that he gathered evidence and took photographs of the crime scenes, which included the clothing left on the street-side where Harris was found.[69]  He also gathered evidence and took pictures at West's apartment, where they located among other things spent casings, bullet fragments and blood samples.[70]

Officer Karl Palmer testified that he gathered evidence from and photographed the Nissan Maxima, which had been used during the murder.[71]  Detective Glenn Burmasater testified that, of the fingerprints taken from the car by Officer Palmer, he was able to match one print to Troy Andrews.[72]

Officer Joe Taffaro determined that the blood samples collected from the car and by Officer Gehagan were blood type "O," the same blood type as Jody Harris.

Detective Joseph Waguespack testified that he interviewed Kenyatta Packnett when he called the police on the day after the murder.[73]  Packnett told the Detective that he was in Terry West's apartment with Jody Harris, Jamie Espadron, and "John Brown."[74]

---

[69]Id., pp. 24-25.

[70]Id., pp. 25-27.

[71]Id., pp. 29-33.

[72]Id., p. 39.

[73]Id., p. 47.

[74]Id., p. 48.  Apparently, this was a reference to John Thomas.

Shortly after they arrived, West let two men in whom he identified as Gentry Sylvester and a man named Troy.[75]  Packnett later identified Troy Andrews from a photographic line-up.[76]  John Thomas was shown the same line-up but was not able to identify anyone probably because he was knocked unconscious.[77]

The evidence presented at trial was more than sufficient for the jury to conclude that Andrews was a principal to the murder and kidnapping of Jody Harris.  The evidence showed that Andrews and his cohorts had the requisite intent to kill or cause great bodily harm to Jody Harris.  Andrews beat Harris on the head with a gun and escorted him from Terry West's apartment, after which Harris's wife was asked for money to gain his safe return and Harris was shot four to five times.

Andrews sole challenge to the sufficiency of the foregoing evidence is that the identification testimony from Packnett, which linked him to the crime, was unreliable, i.e. should not have been relied upon by the jury.  As outlined above, the state trial court denied the motion to suppress that identification testimony and that ruling was never directly challenged in the state appellate courts.  Nevertheless, in <u>Simmons v. United States</u>, 390 U.S. 377 (1968), the United States Supreme Court set forth a two-prong test

---

[75]<u>Id</u>., pp. 47-48, 55.

[76]<u>Id</u>., pp. 50, 58.

[77]<u>Id</u>., p. 57.

for the exclusion of identifications based on impermissibly suggestive photo arrays which deny due process. The first prong requires a determination of whether the identification procedure was impermissibly suggestive. If it is not, the inquiry ends. If it is, a separate inquiry must be made as to whether, under the totality of the circumstances, the suggestiveness leads to a substantial likelihood of irreparable misidentification.

To assist in this endeavor, the United States Supreme Court in Manson v. Brathwaite, 432 U.S. 98 (1977), reaffirmed several factors enumerated in Neil v. Biggers, 409 U.S. 188, 199 (1972), that should be considered when reviewing the reliability of a witness's identification. These include: (1) the opportunity of the witness to view the subject; (2) the witness's degree of attention; (3) the accuracy of the description; (4) the witness's level of certainty; (5) the elapsed time between the crime and the identification; and (6) the corrupting influence of the suggestive identification itself. Manson, 432 U.S. at 114-116; Passman v. Blackburn, 652 F.2d 559, 570-71 (5th Cir. 1981); Herrera v. Collins, 904 F.2d 944, 946 (5th Cir. 1990).

In this case, Packnett testified at trial before the jury that he did not know Troy Andrews prior to this incident.[78] However, based on his detailed testimony, Packnett had ample opportunity to view the man in Terry West's apartment and had full recollection of

---

[78]St. Rec. Vol. 4 of 5, Trial Transcript, pp. 100, 102, 11/17/98.

the happenings in the apartment.[79] He testified that he saw the man enter the apartment. He saw the man assault John Thomas. He was himself hit on the head by Troy Andrews. He also saw Andrews hit Jody Harris and take him out of the apartment.

As for the accuracy of his description, when he spoke with police one day after the shooting, he identified the second shooter, later named Troy Andrews, as a tall, slender black male with a beard.[80] The later testimony apparently substantiated that Andrews had a goatee.[81] Packnett also accurately identified Terry West, the apartment owner, and Gentry Sylvester the first gunman, by name and description because he had known them both.[82]

Packnett admitted that he learned the name Troy from his friend Gentry Sylvester.[83] Although he conceded that the full name of Troy Andrews was provided in part to him by Sylvester and in part by the police, he testified that he selected the picture from the lineup without any influence or promise from the police.[84]

---

[79]See Id., pp. 94-100.

[80]Id., pp. 107-08, 109.

[81]According to the facts outlined by the Louisiana Fourth Circuit, the goatee was acknowledged during the testimony of Andrews's aunt which is not part of the record before this court.

[82]St. Rec. Vol. 4 of 5, Trial Transcript, pp. 108, 109, 11/17/98.

[83]Id., p. 106.

[84]Id., pp. 102-103, 108.

The testimony at trial demonstrated that Packnett selected Troy Andrews picture out of a line-up in spite of the fact that the pictured man did not have the beard or goatee he saw on the night of the murder. Packnett was able to identify Andrews's face apart from any facial hair he may have had on the night of the murder. Packnett testified that he gave police a description of the man before he learned the name Troy. He also testified that he picked the man out of a photographic line-up before he was told the name Troy Andrews by police. Andrews, therefore, has not established that the photographic line-up was unduly suggestive or that the police influenced Packnett's photograph selection.

More importantly, he has not demonstrated here that the jury erred in finding Packnett's testimony to be credible and in considering the identification in reaching its verdict. The fact that conviction may have been based on the credibility of witness testimony is insufficient to supplant the jury's determination of guilt. Green v. Johnson, 160 F.3d 1029, 1047 (5th Cir. 1998). Review of the sufficiency of the evidence does not include review of the weight of the evidence or of the credibility of the witnesses. Schlup v. Delo, 513 U.S. 298, 330 (1995) (under Jackson resolving credibility issues is generally beyond the scope of appellate review); United States v. Goff, 155 Fed. Appx. 773 (5th Cir. 2005) (citing United States v. Garcia, 995 F.2d 556, 561 (5th Cir.1993)). Instead, the narrow standard of review under Jackson

"gives full play to the responsibility of the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. "The trier of fact has broad discretion to 'resolve conflicts in testimony, to weigh evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" Green, 160 F.3d at 1047 (quoting Jackson, 443 U.S. at 319). The jury was acting well within its discretion to consider and weigh the credibility of Packnett's identification testimony in reaching their verdict of guilty.

In sum, the evidence of Andrews's guilt was more than sufficient to support the jury's verdict. The state courts' denial of relief on this claim was not contrary to, or an unreasonable application of, Supreme Court precedent. Andrews is not entitled to relief on this claim.

VII. INEFFECTIVE ASSISTANCE OF COUNSEL

Andrews alleges that his counsel gave ineffective assistance when he failed to effectively cross-examine the State's witnesses and failed to interview witnesses prior to trial to assure a more effective cross-examination. Specifically, Andrews claims that his counsel did not subpoena John Thomas to trial and did not interview Thomas or Packnett before trial. His particular focus, once again, is on the identification testimony given by Packnett. He claims

that his counsel should have pursued testimony from John Thomas since Packnett was the only person who identified him.

Andrews also argues that his counsel could have enhanced his cross-examination of Packnett had he properly investigated prior to trial. He specifically contends that counsel failed to ask Packnett about his opportunity to view the attacker. He also argues that Packnett's testimony was inconsistent in the details of the events at West's apartment and counsel did not adequately challenge these inconsistencies.[85]

Andrews first raised this claim in his application for post-conviction relief. The last reasoned decision on this issue was that of the Louisiana Fourth Circuit which held that Andrews "failed to demonstrate that relief should be granted" and found no error in the trial court's denial of relief.[86]

The issue of ineffective assistance of counsel is a mixed question of law and fact. Motley v. Collins, 18 F.3d 1223, 1226 (5th Cir. 1994). Thus, the question before this court is whether the state courts' denial of relief was contrary to, or an unreasonable application of, United States Supreme Court precedent.

---

[85]The State did not address this claim on the merits. Instead, the State engaged in a specious discussion of technical exhaustion on the assumption that Andrews did not properly raise this claim in the state courts. As discussed above, even if Andrews did not properly exhaust this claim, this court is not prohibited from considering the lack of merit. 28 U.S.C. §2254(b)(2).

[86]St. Rec. Vol. 5 of 5, 4th Cir. Order, 2003-K-0784, 5/22/03.

The standard for judging the performance of counsel was established by the United States Supreme Court in _Strickland v. Washington_, 466 U.S. 668 (1984). In _Strickland_, the United States Supreme Court established a two-part test for evaluating claims of ineffective assistance of counsel in which the petitioner must prove deficient performance and resulting prejudice. _Strickland_, 466 U.S. at 697. The Supreme Court first held that "the defendant must show that counsel's representation fell below an objective standard of reasonableness." _Id_. at 687-88. Second, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." _Id_. at 694; _United States v. Kimler_, 167 F.3d 889, 893 (5th Cir. 1999).

In deciding ineffective assistance of counsel claims, this court need not address both prongs of the conjunctive _Strickland_ standard, but may dispose of such a claim based solely on a petitioner's failure to meet either prong of the test. _Kimler_, 167 F.3d at 893. A habeas corpus petitioner "need not show that 'counsel's deficient conduct more likely than not altered the outcome in the case.' It is not enough, however, under _Strickland_ 'that the errors had some conceivable effect on the outcome of the proceeding.'" _Motley_, 18 F.3d at 1226 (quoting _Strickland_, 466 U.S. at 693).

On federal habeas review, scrutiny of counsel's performance "must be highly deferential," and the court will "indulge a strong presumption that strategic or tactical decisions made after an adequate investigation fall within the wide range of objectively reasonable professional assistance." <u>Moore v. Johnson</u>, 194 F.3d 586, 591 (5th Cir. 1999) (citing <u>Strickland</u>, 466 U.S. at 689-90). In assessing counsel's performance, a federal habeas court must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time of trial. <u>Strickland</u>, 466 U.S. at 689; <u>Neal</u>, 286 F.3d at 236-37; <u>Clark v. Johnson</u>, 227 F.3d 273, 282-83 (5th Cir. 2000), <u>cert. denied</u>, 531 U.S. 1167 (2001). "A court must indulge a 'strong presumption' that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight." <u>Bell</u>, 535 U.S. at 697 (citing <u>Strickland</u>, 466 U.S. at 689-90). This court must apply the "strong presumption" recognized in <u>Bell</u>.

In doing so, federal courts have consistently recognized that tactical decisions when supported by the circumstances are objectively reasonable and do not amount to unconstitutionally deficient performance. <u>Lamb v. Johnson</u>, 179 F.3d 352, 358 (5th Cir. 1999), <u>cert. denied</u>, 528 U.S. 1013 (1999) (citing <u>Rector v.</u>

35

<u>Johnson</u>, 120 F.3d 551, 564 (5th Cir. 1997) and <u>Mann v. Scott</u>, 41 F.3d 968, 983-84 (5th Cir. 1994)). Federal habeas courts presume that trial strategy is objectively reasonable unless clearly proven otherwise. <u>Strickland</u>, 466 U.S. at 689; <u>Moore</u>, 194 F.3d at 591. The burden is on petitioner to demonstrate that counsel's strategy was constitutionally deficient. <u>Id</u>.

Andrews first challenge is to counsel's failure to interview and secure the presence of John Thomas at trial. As a general rule, "'[c]omplaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified are largely speculative.'" <u>Graves v. Cockrell</u>, 351 F.3d 143, 156 (5th Cir. 2003) (<u>quoting</u> <u>Buckelew v. United States</u>, 575 F.2d 515, 521 (5th Cir. 1978)). Nevertheless, the record reflects that John Thomas moved to California years prior to trial and may have been unavailable to the defense.[87]

For example, at trial on November 17, 1998, Packnett testified that John Thomas was living in California and he had not spoken with him since these events happened.[88] Prior to that, at the suppression hearing held August 16, 1996, the State advised the trial court that John Thomas was living in Oakland, California, and

---

[87]<u>See</u> St. Rec. Vol. 2 of 5, Motion for New Trial, Memorandum in Support, pp. 1-2, 1/12/99; St. Rec. Vol. 4 of 5, Trial Transcript, p. 186, 11/17/98.

[88]St. Rec. Vol. 4 of 5, Trial Transcript, pp. 94, 113, 11/17/98.

not available.[89]   The State sought another hearing date to take Thomas's testimony or a continuance until the date of trial to minimize the State's expense.[90]   Andrews counsel joined in the objection to delay of the hearing to the trial date because counsel would not be able to adequately prepare for the witness.[91]   The objection was overruled and the matter was held open until the trial date.[92]

The record does not indicate what efforts were made by the State or defense counsel to secure Thomas for trial.   The record reflects that Thomas was not called at the co-defendants' trials either.[93]   However, during Andrews's trial, his counsel was able to obtain testimony from Detective Waguespack that John Thomas did not pick Andrews out of the photographic line-up, the same one shown to Packnett.[94]   Packnett also testified that Thomas was unconscious during most of the events at West's apartment.[95]

Andrews has not shown that Thomas's presence would have been any more beneficial to the defense than this testimony, which

---

[89]St. Rec. Vol. 3 of 5, Motion Hearing Transcript, pp.3, 26, 8/16/96.

[90]Id., p. 3.

[91]Id., pp. 3-4.

[92]Id., p. 4; St. Rec. Vol. 1 of 5, Minute Entry, 8/16/96.

[93]St. Rec. Vol. 1 of 5, Minute Entry (Terry West), 2/10/98; Minute Entry (Gentry Sylvester), 5/13/98.

[94]St. Rec. Vol. 4 of 5, Trial Transcript, p. 57, 11/17/98.

[95]Id., p. 97-98.

indicated to the jury that Thomas did not link Andrews to the crime. Andrews has failed to establish that but for counsel's failure to present Thomas at trial or interview him before trial, the outcome of the proceedings would have been different.

Andrews also contends that his counsel did not adequately cross-examine Packnett with respect to the identification and that he should have interviewed Packnett prior to trial to develop a more thorough cross-examination.

Contrary to Andrews's arguments, his counsel questioned Packnett extensively about the accurateness of his identification. The court already addressed the Manson factors raised by Andrews with regard to the accuracy and reliability of Packnett's identification.[96] Nevertheless, Andrews's counsel made a concerted effort to challenge Packnett's recollection and the reliability of the identification during cross-examination.

Counsel asked Packnett about the lighting conditions in the apartment on the night of the incident.[97] He questioned Packnett extensively about the actions of the two gunmen upon entering the apartment. He questioned Packnett about the actions of John Thomas which led one gunman, alleged to be Andrews, to pull Thomas down

---

[96]See pages 28 through 31 of this report.

[97]Id., p. 105.

38

and hit Thomas with a gun.[98]  Counsel posed additional questions eliciting details about the timing of the events and the locations and actions of each individual in the apartment.[99]

Counsel was direct in asking Packnett whether he knew Troy Andrews prior to that night.[100]  This led counsel to inquire how Packnett came to learn Andrews's name and the physical description, tall, black male with a beard, which he gave to the police. Counsel's pointed questions implied that Packnett's identification of Troy Andrews may have been influenced by the police.[101]  Counsel also attempted to demonstrate for the jury that the general physical description, especially the beard, did not match the pictures ultimately made part of the line-up.  Counsel also challenged the timing of when Packnett gave the description and when the photographic line-up was conducted.  Some of this questioning was based on counsel's reference to the prior testimony given by Packnett at the suppression hearing in an effort to emphasize alleged inconsistencies.[102]  This also demonstrates that counsel was prepared for the cross-examination.

---

[98]Id., pp. 105-06.

[99]Id., pp. 105-06, 112-13.

[100]Id., p. 106.

[101]Id., pp. 108-11.

[102]See e.g., Id., p. 108.

Andrews has not shown that his counsel's cross-examination of Packnett was deficient. Each of these questions was designed to support the defense theory that Packnett's identification of Troy Andrews was contrived or influenced by the police. The fact that counsel's efforts may not have been successful does not render his performance unconstitutional under <u>Strickland</u>. <u>Martinez v. Dretke</u>, 99 Fed. Appx. 538, 543 (5th Cir. 2004). "[I]t is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." <u>Strickland</u>, 466 U.S. at 689 (citations omitted).

Andrews has not established that counsel's performance was below the standards set forth in <u>Strickland</u>. The state courts' denial of relief on this issue was neither contrary to, or an unreasonable application of, Supreme Court precedent. Andrews is not entitled to relief on this claim.

**<u>RECOMMENDATION</u>**

It is therefore **RECOMMENDED** that the petition of Troy Andrews for issuance of a writ of habeas corpus under 28 U.S.C. §2254 be **DENIED** and **DISMISSED WITH PREJUDICE.**

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within ten (10) days after being served with a copy shall bar that party, except upon grounds of plain

40

error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v.</u> <u>United Servs. Auto. Ass'n</u>, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).

New Orleans, Louisiana, this __3rd__ day of ____April____, 2009.


ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE